# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

CRYSTAL CASTILLO, *et al.*,      )
                               )
             Plaintiffs,     )
vs.                           )     NO.  CIV-12-0448-HE
                               )
ANTHONY BOBELU aka TONY BOBELU,  )
in his individual capacity, *et al.*,    )
                               )
             Defendants.     )

## ORDER

Plaintiffs Crystal Castillo, Lisa Garell, Angela Gaytan, Dana Reeder, and Nancy Robinson filed this action against Anthony Bobelu aka Tony Bobelu, Russell Humphries, Bud Dolan, Ruby Jones-Cooper, John Larsen, Charlotte Day, and Mary Pavliska, in their individual capacities, asserting claims under 42 U.S.C. § 1983 for violations of their Eighth Amendment rights.[1] Plaintiff allege that, while they were inmates at the Hillside Community Corrections Center "(Hillside)" in Oklahoma City, they were "subjected to sexual abuse while participating in a required inmate job assignment at the Oklahoma Governor's Mansion arranged" by Hillside.  Amended Complaint, ¶ 2.  All defendants but Bobelu have moved for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury

---

[1]*Other defendants were initially sued, but plaintiffs' claims against them were dismissed without prejudice.*

could find in favor of the nonmoving party on the evidence presented." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013) (internal quotations omitted). Having considered the submissions of the parties in light of this standard, the court concludes the motions of defendants Jones-Cooper, Dolan, Larsen and Humphries should be granted, the motion of defendant Day should be denied, and the motion of defendant Pavliska should be granted in part and denied in part

<u>Background</u>

The background facts are substantially undisputed and, to the extent disputes exist, the court views the evidence in the light most favorable to plaintiffs. From February 2008 to August 2009, plaintiffs were inmates at Hillside and in the custody of the Oklahoma Department of Corrections ("DOC"). Hillside participated in a work program, the Prisoner Public Works Program ("PPWP"), that allowed offenders to work off-site at different state offices. Plaintiffs worked during the day doing grounds maintenance at the Oklahoma Governor's Mansion, where they were supervised by the groundskeeper, Anthony Bobelu, and by Bobelu's immediate supervisor, Bud Dolan. Both Bobelu and Dolan were employees of the Oklahoma Department of Central Services ("DCS"). Dolan was the State Capitol Park Administrator. Defendants Ruby Jones-Cooper, John Larsen, Charlotte Day, and Mary Pavliska were DOC employees who worked at Hillside. Jones-Cooper was Hillside's district supervisor, Larsen was a supervising case manager and Day and Pavliska were guards or corrections security officers. Plaintiffs claim that Bobelu and Russell Humphries, another DCS employee who was a cook at the Governor's Mansion, sexually harassed and sexually

assaulted them.

When Hillside inmates work at places such as the Governor's Mansion, the DOC does not have a guard stay with the women at the work site. Instead, they are supervised by state workers employed at the work site, who function like guards. These individuals go through an eight hour training program. Defendant Jones-Cooper testified that, like the correctional facility's officers or guards, the "supervisors are taken through training, through policies and given instructions on supervising the women." Doc. #101-15, pp. 8-9. At least when conducted by Larsen, the training usually consisted of the supervisor's review of a CD titled Working Successfully with Female Offenders and a DOC document titled Sexual Misconduct with Offenders. Larsen would send those materials to the supervisor and then require written acknowledgment that he or she had reviewed and understood the CD and the policy. *See* Doc. #101-12. In contrast to the training received by the off-site supervisors, facility guards were given eight weeks of training initially and then yearly re-education.

Jones-Cooper acknowledged that there was the potential for "over familiarity" and "[i]nappropriate contact" if female inmates worked on a job site with only male employees. Doc. #101-15, pp. 10,11. She indicates she was not aware until after Bobelu and Humphries' alleged misconduct was exposed that there were no females working on the grounds crew at the Governor's Mansion other than the female inmates. She stated that if she had been aware of that she thought she would have discussed alternatives such as the transfer of another female employee to that area, placement of the inmates elsewhere or their removal.

Offenders at Hillside were instructed that they should report any wrongdoing and

DOC employees were to report sexual harassment or misconduct up the chain of command. It is unclear whether Hillside inmates could report sexual harassment or assaults anonymously. *See* Doc. #101-15, pp. 12-13.

Bobelu was hired by DCS in November 2006. Plaintiffs concede that there were no "warning signs" at that time. Doc. #96, p. 8, ¶23. Not long after he started working, Dolan sent him to DOC's main office "to review the sexual misconduct with offenders and working successfully with female offenders course."[2] Doc. #85-30, p. 4. DOC was responsible for training Bobelu with respect to his working with inmates.

Defendants contend that no one at either DCS or the DOC was aware of Bobelu and Humphries' alleged misconduct until Friday, May 29, 2009, when plaintiff Gaytan called Dolan requesting a letter of recommendation for employment. Plaintiffs contest the alleged lack of knowledge, at least with respect to Bobelu's conduct, citing Dolan's statement that "[t]hat was the first incident involving [Bobelu and] an inmate." Doc. #101-4, p. 4.[3]

The evidence offered shows that Dolan had been aware, before May 29, 2009, of another episode of questionable behavior involving Bobelu. Dolan told a DOC investigator

---

[2]*Dolan stated that Bobelu went for the training a week after he was hired. He said Bobelu received training documents, which he read, supervised inmates for a week and then went to DOC for training. Doc. #101-5, p. 11. While Dolan said Bobelu was trained at DOC's main headquarters, Jones-Cooper said the training occurred at Hillside. The discrepancy is not material for purposes of the summary judgment motions, as plaintiffs simply deny that Bobelu received appropriate training. Doc. #96, pp. 8-9, ¶24.*

[3]*References are to the CM/ECF Document number and CM/ECF page number. Exhibits will be identified by CM/ECF document number. For example, page 110 of plaintiff Garell's deposition, Exhibit 7 to Doc. #85, will be identified as Doc. #85-7, p. 40.*

that, shortly after Bobelu was hired, in May 29, 2007, there had been an "incident involving a student laborer." *Id.* The individual, Samantha Smedley, was a temporary employee who, on her second day of work was thirty minutes late and then also took a long lunch and left work early. When Dolan verbally reprimanded her, she told him that Bobelu had made comments about her sexuality – "[s]omething to the effect that she was – I recall it was like a baseball term, like, oh, you're a switch-hitter, or something like that, having to do with her liking same-sex type of thing." *Id.* at pp. 5-6. She also told Dolan that she did not appreciate Bobelu adjusting the backpack blower when it was on her back. However, Dolan stated in his affidavit that she did not tell him that Bobelu had "touched her in a sexual way or that he groped her or anything along those lines." Doc. #85-30, p. 5.

Because he had never heard any similar complaints about Bobelu from any other temporary worker or inmate, Dolan testified that he was skeptical and thought Ms. Smedley might be trying to blame Bobelu for her performance issues or divert attention away from them. Dolan said he told Bobelu to stay away from her and he then investigated the allegations. He stated he spoke with several inmates, all of whom said they had never had an experience like that with Bobelu. He also spoke with the inmate who was in the room when Bobelu allegedly made the remark. She told him she did not hear any inappropriate comment.

Dolan said that when he confronted Bobelu with Smedley's allegations, he denied them. As Dolan had had other problems with Smedley's job performance and also had caught her in a lie, he did not believe what she told him about Bobelu. After Dolan told his

supervisor that Smedley was not working out, she was reassigned.

Bobelu performed well during 2008, his second year, and Dolan did not receive any complaints about his behavior. However, Dolan testified he did discipline Bobelu by giving him verbal warnings for "having the one-on-one situations with . . . two particular inmates," Doc. #101-4, p. 8, Callie Johnson, a former Hillside inmate who worked at the Governor's Mansion until July 2008, and Lisa Garell. Dolan testified that he "had to tell [Bobelu] on numerous occasions like no one-on-one contact, those kind of things." Doc. #105-5, p. 5.[4] He indicates he counseled Bobelu about the need to have a third party present, telling him that he could not "ride around in the truck with just one inmate" or "ride around on the golf cart with just one inmate." Doc. #101-4, p. 9. He also warned Bobelu about assigning certain inmates to be supervisors or "in charge of people." *Id*. at p. 8.

At some point Dolan posted the no one-on-one rule as one of the DCS's Rules for PPWP, though that may not have occurred until May 21, 2009.[5] The DOC policy prohibiting Sexual Misconduct with Offenders also was posted on a bulletin board. Doc. #85-30, p. 47.

At one point Dolan had Ms. Johnson reassigned so she no longer worked at the Mansion, but changed his mind when Ms. Johnson asked for her job back and said she

---

[4]*Plaintiffs assert that "Dolan never told Bobelu to stop having one-on-one contact with inmates." Doc. #96, p. 12, ¶8. They mischaracterize his testimony. What he said was:"I had to tell him on numerous occasions like no one-on-one contact, those kinds of things. Stop. Stop that. No, I don't think I ever used that word." Doc. #101-5, p. 5,*

[5]*See Doc. #101-17.*

"would not do that anymore. In other words hanging out in Tony's office and that kind of thing." Doc. #101-4, p. 7.[6] Dolan did not counsel her when she returned that she was not to have one-on-one contact with Bobelu and also did not explain to Bobelu that Ms. Johnson's return was conditioned on their following the rules. He did not discuss with either of them why she had been reassigned. After Ms. Johnson returned, Dolan testified that "pretty soon" they were "joined at the hip again" until she was released. Doc. #101-4, pp. 7-8.

Plaintiffs claim Ms. Johnson had a sexual relationship with Bobelu and that the DOC guards and other DCS employees, including Dolan, were aware of it. However, the only evidence they offer to demonstrate knowledge of the affair is inadmissible hearsay – a telephone call that Ms. Garell stated that Tony Bobelu told her that Juanita Bobelu made.

Dolan later saw Ms. Johnson driving Bobelu's car in April 2009, after she had been released from custody and was no longer working at the Governor's Mansion. According to Dolan, he reported this to his supervisors, but they decided that "it had been eight months since Callie had left DOC custody and thus this relationship was not any of [their] business." Doc. #85-30, pp. 11-12, ¶25.[7]

---

[6]*While defendants assert Ms. Johnson was removed because Dolan was concerned that she and Bobelu were talking too much about personal relationships, which was not allowed, the exhibit cited to support their assertion, Exhibit 24, was "omitted." Doc. #85-24.*

[7]*Plaintiffs dispute this factual assertion, citing Dolan's deposition testimony in which he states that he was not aware of the correctional facility rule that prohibits DOC employees from seeing any person until he or she has been out of custody for 180 days and had not been told that the rule applied to DCS employees. The fact that he was unaware of the rule or never mentioned the incident to Bobelu does not controvert his statement that he told his supervisors that he thought*

After Ms. Johnson had been released and was no longer working at the Governor's Mansion, Dolan observed Bobelu spending one-on-one time with plaintiff Garell. He testified that after he had told Bobelu to cease spending time alone with her he saw them on May 18, 2009, riding in a truck together and "wrote him up for that." Doc. #101-5, p. 15.[8]

Dolan sent Bobelu a memo dated May 18, 2009 regarding "Conduct with Inmates." In it he stated:

> I have established in informal discussions that this is unacceptable to favor one inmate over another or allow yourself to habitually be in one on one situations with the same inmate. It is established in the DOC rules that one inmate cannot be over other inmates. According to the agency's progressive discipline policy and as your supervisor I must manage for success and use prompt positive action to avoid more serious discipline action by addressing mistakes or misconduct issues with verbal counseling, mentoring, and additional training.
>
> Do not favor one inmate over another. Treat all the Inmates equally. Do not continue to get into one on one situations in the shop, vehicles, or office. Do not allow any Inmate to think she has seniority over the others because seniority is not recognized [by] DCS or DOC.
>
> These behaviors have negative effect on Inmate morale and job performance and it could have consequences for you for repeat infractions.
>
> Here are the steps we agreed on to take to correct the problem:
> 1. Training
> 2. Mentoring

Doc. #101-12, p. 7.

---

*Bobelu was doing something he should not be doing. (While plaintiffs refer to pp. 82-83 of Dolan's deposition (Doc. #101-5), only p. 82 is attached.).*

[8]*Although plaintiffs assert that "Dolan admits that these events occurred habitually and he made no efforts to inform DOC and/or investigate the incident," they cite no evidence and do not identify what "incident" they are referring to. Doc. #96, p. 9, ¶30.*

The same day Dolan sent a memo to Charlie Effinger and Mark Sauchuk[9] stating that he had talked to Bobelu "about paying attention to the rules regarding Offenders," treating them equally, avoiding one on one situations and not letting offenders supervise other offenders. He also stated that Bobelu was "going to receive additional PPWP training through DOC soon." Doc. #101-12, p. 8.

Dolan stated that he did not have any additional issues with Bobelu until Friday, May 29, 2009, when he spoke with Ms. Gaytan about a letter of recommendation. Ms. Gaytan told Dolan, during their conversation, that she did not want to pick up the letter from Bobelu because she was offended by his conduct. After Ms. Gaytan described some of Bobelu's behavior, Dolan decided he wanted to talk to her further about Bobelu and giver her the letter in person. When she picked it up, Dolan questioned her about Bobelu and she described one incident when she was alone in Dolan's office and Bobelu came in, shut the door and made unwelcome sexual advances. She told Dolan that it was necessary to force him to stop and also said that Bobelu had "made sexual overtures to several other Offenders," including Crystal Castillo. Doc. #85-3.

Dolan immediately had Bobelu's work assignment changed. Bobelu was notified that day, May 29, 2009, that he was being reassigned to a different work location pending the resolution of allegations that he had behaved inappropriately with offenders. Plaintiffs admit that "[a]s soon as Angela Gaytan told Dolan that Bobelu had sexually harassed her [he] made

---

[9]*Effinger and Sauchuk were Dolan's supervisors. See Doc. #90, p. 21, ¶39.*

sure that Bobelu did not return to the Governor's Mansion grounds and that he was not around other inmates." Doc. #90, p. 22, ¶41. The following Monday, June 1, 2009, the DOC was notified and an Internal Affairs investigation into Ms. Gaytan's allegations was requested and authorized. Some inmates told the investigator that Bobelu had not behaved inappropriately, while others stated he made inappropriate sexual comments to female workers. Two inmates told the investigator that they had been raped, once by Humphries, the other repeatedly by Bobelu. Bobelu was interviewed and denied all the allegations, while Humphries referred the investigator to his attorney.

Based on information obtained during the investigation, on July 17, 2009, both Bobelu and Humphries were placed on administrative leave with pay. DCS terminated them on September 30, 2009, and recommendations for prosecution were sent to the Oklahoma County District Attorney.

This action was filed on January 3, 2011. It was voluntarily dismissed without prejudice on April 26, 2011, and later refiled. Plaintiffs claim defendants Bobelu and Humphries violated their Eighth Amendment rights by subjecting them to cruel and unusual punishment, that defendants Day and Pavliska violated their constitutional rights by failing to report Bobelu and Humphries' verbal harassment and sexual abuse, and that defendants Jones-Cooper, Dolan and Larson were subject to supervisory liability for the alleged constitutional violations committed by Bobelu and Humphries.

The facts pertinent to each individual plaintiff follow.

Dana Reeder

Plaintiff Dana Reeder testified that Bobelu's harrassment began in October 2007, when he rubbed against her and it escalated from there. She stated that, in addition to groping and other inappropriate behavior, he forced her, by threats, to engage in oral sex and intercourse. Ms. Reeder also stated that she was raped by both Bobelu and Humphries on April 22, 2008, and that, on January 13, 2009, the day she was released from DOC custody, Bobelu asked her into his office and told her to perform oral sex on him one last time. She said she complied because Bobelu threatened to call Hillside and say she had done something wrong. Ms. Reeder did not tell any state employees about Bobelu or Humphries' misconduct until January 12, 2009. She testified that she told defendant Pavliska that day that she had been sexually abused by Bobelu and Humphries, but refused "to tell her the exact details of what happened." Doc. #85-20, pp. 28-29. Ms. Reeder said Pavliska told her to return to her dorm and she "didn't hear nothing else after that." *Id.* p. 31. She also said that Pavliska did not refer her to anyone and, to her knowledge, did not report what Reeder had told her to anyone. Doc. #101-8, p. 20.

Pavliska testified that one afternoon, possibly in 2008, she picked up the offenders who were working at the Governor's Mansion and took them back to Hillside. Reeder was in the group and, as they were walking into the facility, she asked to speak with Pavliska privately. Pavliska stated that Reeder became visibly upset and started crying. Pavliska could not recall exactly what Reeder told her that day but believed she told her "that something bad had happened at the Governor's Mansion and she did not want to go back but did not provide any details as to why." Doc. #101-10, p. 3, ¶7. Pavliska said that she "asked

for further details but Reeder did not want to provide those at that time." *Id.* She stated that "[t]he information that Reeder conveyed, along with outward showing of being upset, caused [her] to bypass the chain of command and report the information directly to Chief James Smith." *Id.* at ¶8. Although she usually would have reported the incident to the shift supervisor first, Pavliska said that individual was "busy at that exact time and [she] decided that the information needed to be reported immediately." *Id.* Pavliska stated that she went to Chief Smith's office, reported what Reeder had told her and, after Reeder was called in to speak with him, left. She said she then went and informed defendant Day, the shift supervisor on duty, of what Reeder had told her. Pavliska stated she did not know what happened after that. She testified that she was supposed to complete paperwork in such a situation but does not remember if she actually did it. Pavliska claims that Reeder was the only inmate who ever reported misconduct at the Governor's Mansion to her and she only did it that one time.

Lisa Garell

Plaintiff Lisa Garell testified to six incidents of sexual misconduct involving Bobelu beginning shortly after she started working at the Governor's Mansion. The first several involved Bobelu rubbing his crotch, exposing himself and rubbing against her. Then, on December 19, 2008, Ms. Garell testified that Bobelu raped her. She stated he raped her again

in February 2009 and April 2009.[10]  Although Ms. Garell at one point stated that the April 2009 encounter was the last time that Bobelu abused or harassed her, she also testified that sometime later Bobelu was groping her in the greenhouse when Dolan walked in.  It is unclear exactly when in May this occurred.  Defendants assert that if Dolan witnessed the groping incident, it happened on Bobelu's last day, May 29, 2009.  *See* Doc. #88, p. 16, ¶37. Plaintiffs dispute this, apparently contending that it was the groping that triggered Bobelu's May 18 written discipline.  *See* Doc. #96, p. 13, ¶¶13-14.

Ms. Garell did not tell any state employee about the attacks until sometime after the second rape.  She said she told defendant Pavliska after the second rape that there were "things going on at the governor's mansion that shouldn't be going on" and that she "need[ed] to talk to somebody about it."  Doc. #85-7, p. 32.  She said she also told Pavliska that "[h]e's doing things he shouldn't be doing," but that Pavliska told her she should keep quiet and not say anything to anyone because she was "only going to cause [herself] problems."  *Id.*

Ms. Garell also testified that she had discussed Bobelu's misconduct with Mrs. Hutch, who apparently was a DOC employee,[11] and defendant Charlotte Day, another  Hillside guard.  It is not clear what Ms. Garell told Ms. Day.  Ms. Garell testified that Day said she

_____

[10]*Ms. Garell told the DOC investigator that the rapes occurred in January and March 2009. The court does not find the discrepancy significant for purposes of defendants' summary judgment motions.*

[11]*Defendant Day describes Ms. Hutch as "an unknown DOC employee and non-Defendant." Doc. #89, p. 31.  No evidence was cited regarding any discussions Ms. Garell had with Mrs. Hutch.*

knew "there was things going on at the governor's mansion and she wanted us to tell her about it." Doc. #85-7, p. 38. When asked what Ms. Day told her, Ms. Garell said "[s]he already had told me about it. She asked me if I was the new Callie [Johnson] and was I going to have sex with him, too." *Id*, p. 39. Ms. Garell said she did not answer the question – "I didn't say nothing. I just – I was kind of shocked." *Id.* Ms. Garell testified that the statement was made just after Callie Johnson was released from DOC custody, which was July 16, 2008. Based on Day's comment about Callie Johnson, Ms. Garell believes she knew that Bobelu and Johnson were involved in a consensual sexual relationship. She also assumed Day knew that Bobelu was "having sex with the inmates at the governor's mansion," *id.* at p. 50, because she had asked Garell if she was "going to also." *Id.*

Ms. Garell testified that defendant Larsen knew about Bobelu's sexual activity because she "believe[d] that Bud Dolan and him had conversations." Doc. #85-7, p. 46. She said that Bobelu told her that "John Larsen told Bud Dolan to the have meetings to stop Tony." *Id.* She said she did not know if Larsen knew about the attacks on her, but said he was aware about Bobelu's asserted consensual sexual contact with Callie Johnson. She said that Bobelu had told her that "Juanita Bobelu, his wife, had called Hillside and spoke with Chief Smith and told Chief Smith about the consensual affair between Callie Johnson and himself. And she also called the governor's mansion and told them of the affair and that she believed that he was having sex with Callie and other inmates." Doc. #85-7, p. 47. Ms. Garell responded "[y]es," when asked whether "Tony [had] told [her] that Juanita did those things," *id.,* but said she had never personally spoken with Juanita.

Nancy Robinson

Plaintiff Nancy Robinson testified that Bobelu asked her to show him her breasts a couple of months after she started working at the Governor's Mansion. She said she told him he was crazy and walked away. About a month later she said that he and plaintiff Reeder asked her to engage in a threesome, which she refused. Ms. Robinson claims Bobelu made another inappropriate sexual remark, but she never reported any of the incidents or comments to any DOC or DCS personnel. Ms. Robinson did not return to the Governor's Mansion after December 2008.[12]

Angela Gaytan

Plaintiff Angela Gaytan testified that Bobelu showed her pornography on his office computer and made inappropriate sexual comments. At one point he demanded to see her breasts in exchange for letting her make a phone call, then started fondling her and dropped his pants.[13] He later brushed up against her and asked her to have sex with him when she was in the greenhouse. She also testified that she saw him touch Crystal Castillo inappropriately. Ms. Gaytan said she did not want to tell anyone, other than inmates, about the incidents because she did not want to be punished.

Crystal Castillo

Plaintiff Crystal Castillo testified that she worked at the Governor's Mansion for

_____

[12]*Although the testimony regarding this point is somewhat confusing, plaintiffs do not dispute defendants' assertion that, after Ms. Robinson went into lock-down in December 2008, she never returned to the Governor's Mansion.*

[13]*The timing of the events and the dates they allegedly occurred are not clear.*

seven weeks in April and May 2009. During that time she said that Bobelu made inappropriate comments and propositioned her. On one occasion he fondled her. Ms. Castillo never told any state employee about Bobelu's misconduct.

Analysis

Various arguments are pressed by more than one defendant. These shared defenses will be addressed first.

Statute of limitations

Defendants Ruby-Jones, Dolan, Pavliska, Larsen and Humphries[14] contend that the applicable two year statute of limitations[15] bars many of the plaintiffs' claims. Because plaintiffs' original complaint was filed on January 3, 2011, claims based on events or circumstances occurring before January 4, 2009, would not, absent tolling or some other basis for extension, be actionable. This is problematic for some plaintiffs as several of the alleged incidents on which they base their claims occurred before that date. Plaintiffs attempt to avoid the statutory bar by arguing that the continuing violation doctrine applies to their § 1983 claims. They contend that incidents that would otherwise be time-barred are actionable because they are part of the same pattern of unconstitutional conduct. While the Tenth Circuit has not determined whether the doctrine, which it "first recognized and applied . . . in the Title VII context," McCormick v. Farrar, 147 Fed.Appx. 716, 720 (10th Cir. 2005)

---

[14]*Defendant Humphries' limitations defense differs from the others. Because the claims asserted against him fail for another reason, his limitations argument will not be addressed.*

[15]*The parties agree that the appropriate limitations period is two years.*

extends to §1983 lawsuits, *see* Mata v. Anderson, 635 F.3d 1250, 1253 (10th Cir. 2011),[16]

other appellate courts have. The First, Second, Third, Sixth, Seventh and Ninth Circuits have

held that, at least in certain circumstances, the continuing violation doctrine "applies to cases

under § 1983." Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 30 n.6 (1st

Cir. 2012).[17] Having considered those decisions and, based on Nat'l R.R. Passenger Corp.

v. Morgan, 536 U.S. 101 (2002) and Barney v. Pulsipher, 143 F.3d 1299 (10th Cir. 1998),

the court concludes that the continuing violation doctrine applies to plaintiffs' Eighth

Amendment claims.

In Morgan the Supreme Court considered "whether, and under what circumstances,

a Title VII plaintiff may file suit on events that fall outside [the] statutory time period" for

filing a discrimination charge with the Equal Employment Opportunity Commission.

Morgan, 536 F.3d at 105. Although the Court rejected application of the continuing violation

theory to discrete incidents of discrimination, it drew a narrow distinction for hostile work

environment claims. The Court reasoned that:

> Hostile environment claims are different in kind from discrete acts. Their very
> nature involves repeated conduct. . .The "unlawful employment practice"

---

[16]The Tenth Circuit has assumed in several cases that the doctrine applies, but the facts in
those decisions precluded its application. *E.g.,* Parkhurst v. Lampert*, 264 Fed.Appx. 748 (10th Cir.
2008) ("Assuming the continuing violation doctrine applies to § 1983 claims, the doctrine is
triggered by continual unlawful acts, not by continual ill effects from the original violation.)
(internal quotations omitted).*

[17]Shomo v. City of New York*, 579 F.3d 176, 179 (2d Cir. 2009); see* O'Connor v. City of
Newark*, 440 F.3d 125, 128; (3rd Cir. 2006);* Carpinteria Valley Farms, Ltd. v. Cnty. of Santa
Barbara*, 344 F.3d 822, 829 (9th Cir. 2003);* Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d
1014 (7th Cir. 2003);* Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003).*

therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

*Id*. at 115. The Court determined that it did not matter for purposes of the statutory filing period "that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id*. at 117.

In Barney, the Tenth Circuit considered  a sexual harassment and sexual assault claim brought under the Eighth Amendment. The Tenth Circuit's description of the plaintiffs claim parallels that of the Supreme Court in Morgan.  It noted that, although the plaintiffs alleged that the jailer had "subjected them to severe verbal sexual harassment and intimidation, [those] acts of verbal harassment alone [were] not sufficient to state a claim under the Eighth Amendment."  *Id.* at 1310 n.11.  The "claims of verbal harassment [were] only actionable in combination with the assaults."  *Id.*   (Internal quotations omitted).

At least for purposes of determining when the claim accrues, the court sees no persuasive basis for distinguishing between sexual harassment/assault claims brought under Title VII and those asserted as Eighth Amendment violations under § 1983.  Behavior outside the statutory time period will be considered for purposes of assessing defendants' liability, if an abusive act took place within it.[18]

_____

[18]*The court realizes, as defendant Dolan notes, that some of the claimed improper conduct could be considered discrete acts,.  However, as a Title VII hostile work environment claim may*

While the court agrees with plaintiffs that the continuing violation doctrine applies to their claims, it does not agree with the argument they appear to be making that, because they allegedly were subjected to the same type of recurring harm and because there are "multiple events involving multiple Plaintiffs within the applicable Statute of Limitations time," Doc. #96, p. 16, plaintiffs are to be considered as one unit, rather than individually, for purposes of the limitations period. Plaintiffs cite no authority for their novel position and the court is aware of none. Each plaintiff must offer evidence sufficient to create a fact dispute as to whether her § 1983 claims were brought within the two year limitations period. For her claims to be timely, a plaintiff must offer evidence of an abusive act on or after January 4, 2009.

Plaintiffs Reeder, Garell, and Castillo[19] have testified regarding sexually abusive conduct that occurred within the two year limitations period. There is therefore evidence that their claims are timely and they may rely on acts outside the statutory period to establish their claims. Ms. Gaytan also testified regarding at least one incident involving Bobelu that arguably occurred after January 3, 2009.[20] However, the undisputed facts demonstrate that

---

*include "discrete acts," there is no apparent reason, at least in the circumstances present here, to reach a different conclusion in a § 1983 action. See generally Morgan, 536 U.S. at 115-18.*

   *[19]Defendants do not dispute that Ms. Castillo's claims are timely.*

   *[20]Ms. Gaytan testified that Bobelu coerced her into showing him her breasts and fondled her after he let her make a cell phone to her boyfriend who was injured. Doc. #85-17, p. 11. She testified that she was told her boyfriend was stabbed on January 9th, but then said the year "[m]ust have been 2008." Id. at p. 15. However, it is undisputed that Ms. Gaytan was at Hillside from June 8, 2008 until April 9, 2009, and thus worked at the Governor's Mansion in January 2009, not January 2008. Doc. #85-16. Considering that fact and other evidence in the record in the light*

plaintiff Robinson did not return to the Governor's Mansion in 2009, and she has offered no evidence that she had any contact with Bobelu or Humphries after 2008, so her § 1983 claims are time-barred.

Defendants Ruby-Jones, Dolan, Pavliska, and Larsen are entitled to summary judgment on Ms. Robinson claims.[21]

Qualified Immunity

Defendants Jones-Cooper, Dolan, and Larsen, who are sued in their supervisory[22] capacities, have asserted the defense of qualified immunity. This well-established defense "'protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dodds v. Richardson, 614 F.3d 1185, 1191 (10th Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Once the defense is raised, the plaintiffs "bear[] the burden of satisfying a 'strict two-part test.'" Id. (quoting McBeth v. Himes, 598

---

*most favorable to plaintiffs, including Ms. Gaytan's testimony that Bobelu started touching her "at the very end" of the period during which she worked at the Mansion, Doc. #85-17, pp. 12,14, and that she learned her boyfriend had been stabbed on January 9th, id. at pp. 14-15, the court concludes Ms. Gaytan has offered sufficient evidence of an incident within the limitations period to withstand summary judgment.*

*[21]Pavliska makes the additional argument in her reply brief that, even if the continuing violation doctrine applies to § 1983 claims, because "there was no pre-January 3, 2009 act by Defendant Pavliska that could plausibly support a constitutional violation by her .... she would be entitled to qualified immunity." Doc. #110, pp. 5-6. By not raising this argument until her reply brief, defendant Pavliska waived it.*

*[22]Because the "label can be misunderstood as implying vicarious liability [and] Section 1983 does not authorize liability under a theory of respondeat superior, . . . the Supreme Court has suggested the term supervisory liability is a misnomer." Schneider, 717 F.3d at 767 (internal quotations omitted).*

F.3d 708, 716 (10th Cir.2010)). They "'must establish (1) that the defendant[s] violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant[s'] conduct....'" *Id.* (quoting McBeth, 598 F.3d at 716). "'If, and only if, the plaintiff[s] meet[] this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" Koch v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011) (quoting Clark v. Edmunds, 513 F.3d 1219, 1222 (10th Cir.2008)), *cert. denied*, 133 S.Ct. 211 (2012).

Defendants initially assert that plaintiffs cannot establish a constitutional violation, which hinges on plaintiffs' ability to show the existence of "an 'affirmative link' between the supervisor and the constitutional violation." Schneider, 717 F.3d at 767 (quoting Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010)). The affirmative link requirement has "'three related prongs: (1) personal involvement; (2) sufficient causal connection, and (3) culpable state of mind.'" *Id.* (quoting Dodds, 614 F.3d at 1195).

In Schneider the court noted that the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662(2009), had "articulated a stricter liability standard for [the] first element of personal involvement." Schneider, 717 F.3d at 768. The Tenth Circuit has not yet "address[ed] the precise contours of this standard. " *Id.* The court does not have to explore that issue, though, as plaintiffs' claims against Jones-Cooper, Dolan and Larsen do not "turn[] on the question of personal involvement," *id.*, but rather can be resolved on the basis of the state of mind element.

In their amended complaint plaintiffs allege defendants Jones-Cooper, Dolan and Larson "had direct oversight responsibility" over Bobelu and Humphries and "were on notice of [their] behavior . . . and the potential for the violation of the Plaintiffs' Eighth Amendment rights." Amended Complaint, ¶¶98-99. They claim the supervisory defendants "acted with deliberate indifference and deliberate disregard in the training, supervision, investigation, and discipline" of Bobelu and Humphries. ¶100. Defendants essentially argue that they can held liable as supervisors only if they "'**purposefully**' or '**intentionally**' (*Iqbal*) under[took] a course of conduct to sexually harass, sexually assault, or rape the Plaintiffs" or possess[ed] the same 'state of mind' (*Serna/Dodds*) to **intentionally** sexually harass, sexually assault, or rape the Plaintiffs." Doc. #88, p. 35.

While the court disagrees with defendants' stated standards of supervisory liability, it concludes plaintiffs have not offered evidence from which a reasonable jury could find that Jones-Cooper or Bud Dolan or Larsen acted with the required intent.

> The test for a "deliberate indifference" claim under the Eighth Amendment has both an objective and a subjective component. The objective component of the test is met if the harm suffered is sufficiently serious to implicate the Cruel and Unusual Punishment Clause. The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety.

Kikumura v. Osagie, 461 F.3d 1269, 1291 (10th Cir.2006) (citations omitted), *overruled on other grounds* by Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir.2008). It is clear enough that Bobelu and Humphries' alleged conduct satisfies the objective component of an Eighth Amendment claim. The stumbling block for plaintiffs is the subjective component, which requires "that the official actually be 'aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"

Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir.2008) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994). "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Id.* "[A]ctual knowledge of the constitutionally infirm condition" can, though, be inferred solely on the basis of "circumstantial evidence, such as the obviousness of the condition." *Id.* The court must therefore evaluate plaintiffs' evidence pertinent to their assertion that each defendant acted with a "culpable state of mind." *Id.*

Defendant Jones-Cooper

Plaintiffs contend that a supervisor can be held liable under § 1983 if she fails to act upon information that constitutional violations were occurring or if she knew about the unconstitutional conduct and facilitated it, approved it or did nothing about it. Citing Smith v. Cochran, 339 F.3d 1205 (10th Cir. 2003), they assert that "[t]his is not the first time that the State of Oklahoma has encountered issues with the PPWP program," and that "Oklahoma supervisors knew or should have known the issue with the PPWP program." Doc. #98, p. 19. Because Jones-Cooper testified that she was "acutely aware of the alarming prison [rape] statistics," they claim she "had to have known that effective training is necessary to either prevent PPWP supervisors from taking advantage of the women or educating the fellow PPWP supervisors in identifying situations where fellow guards were leading down the path to sexual assaults." *Id*. at p. 20. Noting Bobelu's statement that he was inadequately trained,

plaintiffs assert that Jones-Cooper demonstrated a "complete reckless disregard for the safety of the Plaintiffs and fellow PPWP workers," by requiring only eight hours of instruction for PPWP supervisors when DOC officers receive eight weeks of training. *Id.* at p. 21. They allege that she was aware of the "known risk" that "[h]aving facilities and situations where there are only male guards around female inmates creates problems with inappropriate contact." *Id*. at p. 22.

The court agrees with plaintiffs that if a supervisor knows about misconduct and fails to act or is aware of a significant risk and does not alleviate it, she can be held liable under § 1983. The court does not, though, agree that Smith alerted Jones-Cooper to a substantial risk of harm to the Hillside inmates. A case involving one incident of sexual assault more than ten years earlier at a different work site in a different city under different circumstances was not enough to alert Jones-Cooper to risks faced by female inmates participating in the prisoner works program at the Governor's Mansion.[23] While prior sexual assaults at the same site have been found sufficient to put a supervisor "on notice of the dangerous conditions," Tafoya, 516 F.3d at 917, plaintiffs have offered no evidence that there had been earlier incidents involving sexual misconduct at the Governor's Mansion or, with one exception (the Smith case), with female inmates working elsewhere in Oklahoma pursuant to a prisoner public works project contract. They also did not substantiate their assertion that Jones-Cooper was aware of Bobelu or Humphries' behavior before May 29, 2009 with any

_____

[23]*The sexual assaults in* Smith *allegedly occurred in 1997 and 1998 and the lawsuit was filed in January 2000.*

evidence.

Although Jones-Cooper admitted that female inmates working only with male employees could be problematic, she also testified that she was unaware that the only females on the grounds crew at the Governor's Mansion were inmates. Nothing in the record indicates she knew inmates were working only with males or that such lack of knowledge was even negligent. *See* Tafoya, 516 F.3d at 918 (plaintiff offered expert testimony "to substantiate the degree to which conditions at the Huerfano County Jail deviated from generally accepted standards" ). Moreover, in Barney, 143 F.3d at 1308, the Tenth Circuit reiterated its conclusion that the mere existence of a policy designed to protect female inmates "does not establish an obvious risk that females left alone with male guards are likely to be assaulted." *Id.* at 1311 (quoting Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir.1993)).

The plaintiffs in Barney, inmates at a county jail, were taken from their cell by a jailer, Pulsipher, and raped. Although the jail had a policy requiring two jailers to be present when a female inmate was removed from a cell, Pulsipher was allowed to be the sole guard on duty. Despite the breach of the jail policy, the court declined in Barney "to find knowledge by [the sheriff] and the Commissioners of a substantial risk of harm from the mere fact of [the jailer's] gender." *Id.* It held that "[w]thout any evidence of sexual misconduct in [the jailer's] background or any evidence of previous incidents of sexual misconduct by [] County jailers," plaintiffs did not raise a fact question on whether the sheriff and county commissioners had acted with deliberate indifference. *Id.* A similar conclusion is warranted

here.  Plaintiffs have not demonstrated Jones-Cooper knew of the substantial risk of sexual assault faced by the inmates working at the Governor's Mansion and consciously disregarded that risk.

To the extent plaintiffs seek to hold Jones-Cooper liable because of the alleged inadequate training of certain of the employees who supervised Hillside inmates at the Governor's Mansion received, their claim fails.[24] Plaintiffs' evidence that it was inadequate consists of Bobelu's remark that he was not well trained, and the difference in time spent training off-site supervisors, such as Bobelu, and DOC employees – eight hours versus 8 weeks.  Plaintiffs have not, though, "come forward with evidence pertaining to the adequacy of the instruction" Bobelu did receive.  <u>Barney</u>, 143 F.3d at 1308.  They have not shown what Bobelu was taught or contrasted his training with that given DOC employees or other similarly situated "supervisors."   Here, as in <u>Barney</u>, where "no pattern of [Eighth Amendment] violations existed to put [Jones-Cooper] on notice that [the] training program was deficient,"  the court has "no reason to conclude that [Bobelu] received constitutionally deficient training."  *Id.*  The difference between eight hours of training for an employee whose job incidentally involves the supervision of inmates for limited periods, versus eight weeks of training for a regular DOC employee engaged as a full-time corrections officer, does not, in and of itself, support an inference that the training was inadequate.  Even assuming Bobelu was inadequately trained, plaintiffs at most have demonstrated negligence, which is not sufficient to create a fact question as to whether Cooper-Jones "was deliberately

---

[24]*Jones-Cooper did not hire, train or supervise Bobelu or Humphries.*

indifferent to the conditions at the [Governor's Mansion]." Tafoya 516 F.3d at 921.[25]

Plaintiffs simply have not come forth with enough evidence for a reasonable jury to conclude that Jones-Cooper was deliberately indifferent to the inmates' working conditions at the Governor's Mansion. *See generally id.* at 915, 921 (genuine issue of fact existed as to whether the Sheriff "was aware of prison conditions that were substantially likely to result in the sexual assault of a female inmate," where sheriff, even after three civil suits had been filed against him for sexual assaults that had occurred just three years earlier, "continued to abstain from any meaningful presence at the jail, did not ensure an adequate grievance procedure was in place, and vested responsibility for jail management in unqualified administrators and supervisory staff with criminal histories."). Even if Jones-Cooper should have known of the risk of harm, that is not enough. She must have both "know[n] of and disregard[ed] an excessive risk to inmate health and safety" to be held liable under the Eighth Amendment. *Id.* (internal quotations omitted). Defendant Jones-Cooper's motion for summary judgment as to all plaintiffs' claims will be granted.

Defendant Dolan

Plaintiffs do not dispute that Dolan was not Humphries' supervisor, did not hire, train or supervise him and never saw Humphries behave inappropriately with the inmates. They seek to hold Dolan liable on the basis that he "was aware of multiple incidents of

---

[25]*One of plaintiffs' additional facts, see Doc. #98, p. 13, ¶7, is that the purported anonymous reporting system is not anonymous as the reporting party is required to put her name or room number on the form. Plaintiffs do not, though, explain, the impact of this on their claims against Jones-Cooper.*

inappropriate conduct [by Bobelu] that should have prevented his employment and any association with the female inmates," yet "made no efforts other than some verbal warnings to Defendant Bobelu." Doc. #96, p. 19. Dolan argues that much of the conduct plaintiffs rely on does not rise to the level of serious harm under the Eighth Amendment, that he cannot be held liable under § 1983 because he was unaware of the alleged attacks,[26] that a failure to supervise claim cannot be based on allowing a male to "have unsupervised care and custody of female inmates," Doc. #90, p. 31, that his investigation of Bobelu's remark to Smedley was reasonable and there was no reason to investigate Bobelu's relationship with Ms. Johnson.

Plaintiffs admit that "Dolan had never heard of any sexual assaults or rapes on the governor's mansion worksite and he had never heard of any rapes or assaults at any other PPWP work sites."[27] Doc. #90, p. 22, ¶42; Doc. #96, p. 11, ¶42 . They do, though, challenge his assertion that he was not "on notice that anyone at the Governor's Mansion work site would be raped, assaulted, or harassed," *id. at ¶*43, citing his knowledge of Bobelu's switch hitter remark and the fact that Bobelu violated the no one-on-one rule with two inmates and treated them preferentially. Doc. #96, p. 10, ¶35. That evidence is not enough to create a fact question as to whether Dolan <u>knew</u> that Hillside inmates working under Bobelu's

---

[26]*Although Dolan discusses failure to train, plaintiffs claims against him are based on his alleged failure to supervise. The DOC was responsible for training Bobelu regarding working with inmates.*

[27]*Plaintiffs again cite* <u>Smith</u>, *339 F.3d at 1205, as the basis for why Dolan should have known of the risk. However, for the reasons stated earlier the court rejects plaintiffs' argument that, because of* <u>Smith</u>, *the "Oklahoma supervisors knew or should have known the issues with the PPWP program." Doc. #96, p. 19.*

supervision at the Governor's Mansion faced an excessive risk of sexual assault.

In hindsight it can perhaps be said that Dolan could and should have done more when confronted with Bobelu's inappropriate conduct. Despite the absence of any complaints from any inmates that they were being sexually abused, he should have been aware of the potential hazards of overfamiliarity, as the DOC Sexual Misconduct and Harassment guide warned that it "can lead to sexual misconduct and harassment . . . ." Doc. #101-14. However, awareness that certain behavior could lead to sexual misconduct is not enough to impose supervisory liability. "The standard is subjective, requiring that the official actually be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Tafoya</u>, 516 F.3d at 916 (quoting <u>Farmer</u>, 511 U.S. 837). Moreover, contrary to plaintiffs' assertions, Dolan did not ignore Bobelu's inappropriate conduct. He investigated the Smedley incident and, based on what he knew at that time, discounted it. He also counseled Bobelu about spending too much time alone with Ms. Johnson,, e.g., Doc. #101-5, p. 5, issued a verbal warning, Doc. #101-4, p. 7, and then called DOC and asked them not to send Ms. Johnson back to the Mansion's work crew.[28] He also verbally warned Dolan a couple of times about spending time alone with Ms. Garell and, in mid-May 2009, based on Bobelu's interaction with Garell, issued a written reprimand and directed Bobelu to have further training.

There is evidence of an incident which, if it had occurred earlier, might have created

---

[28]*As Dolan points out, even if, as plaintiffs suggest, he had done an investigation and discovered that Bobelu and Johnson were in a consensual relationship, that would not "suggest a 'substantial risk' that Bobelu would start raping other inmates." Doc. #90, p. 33.*

a fact question as to whether Dolan was deliberately indifferent to the danger Bobelu posed to the inmates. Garell testified that Dolan walked into the greenhouse and saw Bobelu inappropriately touching her on May 18, 2009.[29] Plaintiffs cite that occurrence merely to show that Dolan finally took some action by "initiat[ing] the May 18th retraining emails to John Larsen," Doc. #96, p. 23, rather than as proof that Dolan could be held accountable for Bobelu's misconduct. Regardless, that incident occurred too late to prevent the assaults that are the bases for plaintiffs' claims. No plaintiff has alleged that Bobelu attacked her between May 18 and May 29, when Dolan had him removed from the premises. Garell testified that the groping was her last encounter with Bobelu, Reeder was released from DOC custody in January 2009, and, though Castillo did not specify when during the period in April and May she had encounters with Bobelu, she was transferred to another facility on May 6, 2009. Doc. #85-21. Unfortunately for plaintiffs, what Dolan may have learned on May 18 is not proof of what he knew in the preceding months. *See* <u>Bryson v. City of Oklahoma City</u>, 627 F.3d 784, 789-90 (10th Cir. 2010) ("However, although this evidence may show that the City later acted with deliberate indifference to Ms. Gilchrist's subsequent misdeeds, it is irrelevant to the material question before us – whether the City consciously or deliberately chose in 1983 to ignore a risk of harm which the City had been put on notice of either by a past pattern of wrongful acts or by the high predictability that wrongful acts would occur.").

"At the summary judgment stage, the requirement of deliberate indifference imposes a burden on the plaintiff to present evidence from which a jury might reasonably infer that

---

[29]*Dolan ignores Garell's testimony about the greenhouse incident in his brief.*

the prison official was actually aware of a constitutionally infirm condition." <u>Tafoya</u>, 516 F.3d at 922. Plaintiffs have not met that burden with respect to defendant Dolan. Here, as in <u>Barney</u>, "[w]ithout any evidence of sexual misconduct in [Bobelu's] background or any evidence of previous incidents of sexual misconduct by [Bobelu or other DCS supervisors at the Governor's Mansion], plaintiffs have failed to raise a fact question on whether [Dolan] acted with deliberate indifference" to a substantial risk to female inmates sexually assaulted by Bobelu. <u>Barney</u>, 143 F.3d at 1311. At most they have shown that Dolan negligently supervised Bobelu and that is not sufficient for liability to attach. Defendant Dolan's motion for summary judgment as to all plaintiffs' claims will be granted.

Defendant Larsen

Defendant Larsen was the supervising case manager at Hillside when the incidents underlying this lawsuit occurred. He neither hired nor supervised Bobelu or Humphries, but did train Bobelu. He claims that he is entitled to qualified immunity principally because plaintiffs have no evidence demonstrating he had the culpable state of mind required to violate their Eighth Amendment rights. Plaintiffs respond that Larsen had knowledge of the risk of harm to the inmates, yet failed to train the off-site supervisors properly and failed to investigate the Johnson-Bobelu relationship.

 Plaintiffs do not dispute that none of the inmates working at the Governor's Mansion ever complained to Larsen about being sexually harassed or assaulted and that he was never

informed about any consensual sexual relationship occurring at the Mansion.[30] Relying once again on Smith, they assert "that Oklahoma supervisors knew or should have known the issues with the PPWP program." Doc. #99, p. 21. For the reasons discussed earlier, knowledge of the risk of sexual assault at the Governor's Mansion cannot be imputed to Larsen or any other defendant simply on the basis of Smith.

As one of Larsen's primary responsibilities as a supervisory case manager over the PPWP program at Hillside was to providing training and oversight, the question then becomes whether the alleged sexual misconduct was "a highly predictable or plainly obvious consequence of the relatively short . . . training period." Bryson, 627 F.3d at 789. Plaintiffs assert that, while the eight hour training provided off-site supervisors was insufficient, Larsen neglected to provide even that.[31] They argue that, by sending the training materials to the off-site supervisors and asking them to sign forms acknowledging that the materials had been reviewed, Larsen "deliberately disregard[ed] his duties and ... the deliberate indifference state

---

[30]Ms. Garell testified that defendant Larsen knew about Bobelu's sexual because she "believe[d] that Bud Dolan and him had conversations." Doc. #85-7, p. 46. She said that Bobelu told her that "John Larsen told Bud Dolan the meetings to stop Tony." Id. She said she did not know if Larsen knew about the attacks on her, but said he was aware about Bobelu's asserted consensual sexual contact with Callie Johnson. She said that Bobelu had told her that "Juanita Bobelu, his wife, had called Hillside and spoke with Chief Smith and told Chief Smith about the consensual affair between Callie Johnson and himself. And she also called the governor's mansion and told them of the affair and that she believed that he was having sex with Callie and other inmates." Doc. #85-7, p. 47. She responded "[y]es," when asked whether "Tony [had] told [her] that Juanita did those things," id., but said she had never personally spoken with Juanita. In their response brief plaintiffs do not rely on this testimony to demonstrate that Larsen had knowledge of Bobelu's misconduct and could not, as it is inadmissible hearsay.

[31]Although the training for many of the DCS employees apparently consisted of watching a CD and reading a document regarding sexual misconduct with offenders, Bobelu was sent to the DOC for training.

of mind is achieved."  Doc. #99, p. 21.  They claim Dolan might have reacted appropriately, upon learning of "Bobelu's inappropriate actions with Callie Johnson and Lisa Garell," *id.* at 22, if he had been appropriately trained.

Plaintiffs have failed, though, to explain how the training that was conducted was deficient or offered evidence that "the need for more or different training [was] so obvious that a violation of [plaintiffs'] constitutional right to bodily integrity was likely to result from not providing it."  Schneider, 717 F.3d at 773-74 (internal quotations omitted); *see* Barney, 143 F.3d at 1308 ("Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."); *cf.* Bryson, 627 F.3d at 789 ("We are not persuaded, however, that it was highly predictable or plainly obvious that a forensic chemist would decide to falsify test reports and conceal evidence if she received only nine months of on-the-job training and was not supervised by an individual with a background in forensic science.").  At best plaintiffs have shown that Larsen negligently performed his training responsibilities.

Plaintiffs' remaining basis for holding Larsen accountable under § 1983 consists of his failure to investigate the consensual Johnson-Bobelu relationship.[32]  Again their proof falls short.  They have not offered evidence showing what an investigation would have revealed that would have made it obvious to Larsen that Bobelu was likely to engage in non-consensual sexual conduct with other inmates.  Moreover, it is not enough to show that he

---

[32]*While a dispute exists as to whether the Johnson-Bobelu relationship was sexual while Johnson was still an inmate, it is not disputed that whatever relationship existed was consensual.*

could or should have discovered "'facts from which the inference could be drawn that a substantial risk of serious harm exists.'" <u>Tafoya</u>, 516 F.3d at 916 (quoting <u>Farmer</u>, 511 U.S. 837). To prevail, plaintiffs must show that Larsen actually drew that inference. *Id.*

Plaintiffs' evidentiary submissions are insufficient to create a question of fact for the jury as to whether Larsen "[knew] of and disregard[ed] an excessive risk to inmate health and safety." <u>Barney</u>, 143 F.3d at 1310 (internal quotations omitted). His motion for summary judgment will therefore be granted as to all plaintiffs' claims.

<u>Defendant Day</u>

Plaintiffs allege that defendant Day, who admitted she was responsible for insuring a safe environment for the Hillside inmates, violated their Eighth Amendment rights when she failed to investigate and report defendant Bobelu and Humphries' verbal harassment and sexual abuse.[33] Day responds that she is entitled to qualified immunity essentially because she did not know about Bobelu and/or Humphries' alleged sexual misconduct.

As discussed above, once a defendant asserts qualified immunity on summary judgment, the burden shifts to the plaintiff to offer evidence demonstrating that the defendant violated a constitutional or statutory right and that the right was clearly established at the time of the alleged unlawful activity. <u>Dodds</u>, 614 F.3d at 1191. Defendant Day does not dispute that an inmate has an Eighth Amendment right to "be secure in her bodily integrity and free from attack by prison guards." <u>Barney</u>, 143 F.3d at 1310 (internal quotations

---

[33] *Plaintiffs discuss supervisory liability in their brief responding to defendant Day's motion for summary judgment, but she was not sued in a supervisory capacity.*

omitted) and that the right was clearly established by 2008. Her defense is that plaintiffs lack evidence that she violated that right. She contends plaintiffs cannot show she knew of and disregarded an excessive risk to the inmates' safety.

Day claims that the only evidence plaintiffs offer to demonstrate her knowledge of any sexual misconduct occurring at the Governor's Mansion consists of her alleged comment to Ms. Garell: "'So are you the next Callie Johnson? Are you going to have sex with him too?'" Doc. #89, p. 32. Day argues that, even if she made the comment, it "does not lead to the conclusion that Day would have been on alert that Bobelu or Humphries were going to sexually harass, sexually assault, or rape the Plaintiffs in this case." *Id.* She contends that "[a]t most that comment was an inquiry into a consensual relationship." *Id.* at p. 32-33. It reflects, Day claims, "knowledge that Bobelu was in a consensual sexual relationship with an ex-inmate that was no longer in DOC custody, and a question about whether Garell was also going to have consensual sex with Bobelu after she got out of DOC custody." *Id.* at p. 33. Day argues that the possibility of a consensual relationship with a former supervisor after being released from custody "does not qualify as a '***substantial risk of serious harm'*** under the Eighth Amendment, and there is no '***clearly established law"*** that would have alerted Day of that constitutional harm." *Id.*

Day's argument rests entirely on her interpretation of the comment Garell claims she made and the inferences that can be drawn from it. The court does not agree that the comment can only be interpreted to mean that Day was asking about a post-release relationship. Regardless, that is not plaintiffs' only evidence against Day. Contrary to Day's

assertion, there is evidence that she knew about inappropriate conduct at the Governor's Mansion before May 29, 2009, when Bobelu was removed from the Mansion to another work site. Reeder testified that she told Pavliska that she had been "physically abused at the governor's mansion by Tony Bobelu and Russell Humphries," Doc. #85-20, p.29, and Pavliska testified that she reported the conversation to Day.[34] Pavliska's statement that she reported her conversation with Reeder to Day, alone, is enough to create a fact question for the jury as to whether Day was deliberately indifferent to a known substantial risk of serious harm to the Hillside inmates.[35] Defendant Day did not move for summary judgment on the ground that plaintiffs' claims were barred by the statute of limitations. Her motion for summary judgment as to the claims of all plaintiffs will therefore be denied.

Defendant Pavliska

Defendant Pavliska contends that most of the plaintiffs' claims against her fail because there was no underlying constitutional violation. While Bobelu may have violated state law, she asserts his actions were not egregious enough to violate the Eighth Amendment rights of any defendants but Garell and Reeder, who allegedly were raped. The court does

---

[34]Day asserts that she could not be held liable under the Eighth Amendment even if Pavliska told her that "'something bad happened at the Governor's mansion,'" as that "could mean she broke her nail, or her back, or heard another inmate gossip." Doc. #105, p. 2. The statement could also reasonably be interpreted to means something much more serious.

[35]The court recognizes the conflict in Pavliska and Day's testimony. Either Pavliska reported her conversation with Reeder to Day and Day did nothing with the information or Pavliska did not report the conversation to Day. Because of the inconsistency, plaintiffs may argue alternative or inconsistent theories of liability. See Fed.R.Civ.P. 8(d)(3) ( "A party may state as many separate claims or defenses as it has, regardless of consistency."); Kikumura, 461 F.3d at 1296 (contradictory allegations did not undermine prisoner's Eighth Amendment claim, "[s]ince the Federal Rules allow litigants to plead in the alternative" ).

not have to consider this argument with respect to the claims of plaintiff Robinson as it has concluded they are time-barred. As for the claims of Ms. Gaytan and Ms. Castillo's claim, both testified to incidents of physical contact, including groping, along with verbal harassment. The court concludes that conduct, in the context of this case, is sufficient to create a fact question as to whether Bobelu violated their Eighth Amendment rights.

Next, Pavliska claims that she is entitled to qualified immunity because she did not personally violate any plaintiff's constitutional rights. She asserts that she could not have failed to protect plaintiffs from Bobelu and Humphries because she did not have actual knowledge of their bad acts. She argues that, while she was never told by any plaintiff or any other inmate exactly what was going on at the Governor's Mansion, she took "affirmative action to protect the inmates" by "relay[ing] the allegations of Reeder to two supervisors." Doc. #86, p. 34.

Even if Ms. Garell's statement to Pavliska that inappropriate things were going on at the Governor's Mansion did not put Pavliska on notice of the risk to the plaintiffs, Reeder's conversation with her, during which she said she had been sexually abused, did. A fact dispute exists as to what Ms. Garell and Ms. Reeder told Pavliska and what Pavliska did with that information. Accepting plaintiffs' testimony as true for purposes of defendant's motion, plaintiffs have produced sufficient evidence to create a jury question as to whether Pavliska violated their Eighth Amendment rights by being deliberately indifferent to the substantial risk of serious harm that they faced.

Pavliska's remaining arguments are that plaintiffs' claims are barred by the Prison

Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), because they allege only emotional injuries and not "physical damages," Doc. #86, p. 36, and that plaintiffs Robinson, Castillo and Gaytan failed to exhaust their administrative remedies as required by 42 U.S.C. §1997e(a).[36]

Section 1997e(e) of the PLRA provides:

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

The statute does not require that a plaintiff seek damages for physical injuries, but only that they have sustained a physical injury.[37] The court concludes that, for purposes of satisfying the physical injury requirement of the statute, a person who is raped has sustained a "physical injury."[38] *See* Liner v. Goord, 196 F.3d 132, 135 (2nd Cir. 1999) ("First, there is no statutory definition of 'physical injury' as used in section 1997e(e). Nevertheless, accepting the

_____

[36]*Pavliska does not contend that plaintiffs Reeder or Garell failed to exhaust, only Robinson, Castillo and Gaytan. As the court has concluded the claims of Robinson are time-barred, the defense will only be considered with respect to Ms. Gaytan and Ms. Castillo.*

[37]*Although not applicable here, the statute was modified, effective March 7, 2013, to provide: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)."*

[38]*While the single incident of fondling reported by Ms. Castillo and the physical contact reported by Ms. Gaytan might not satisfy the statutory requirement, they could still seek nominal damages, even if the affirmative defense was available.* Searles v. Van Bebber, *251 F.3d 869, 878-79 (10th Cir. 2001) ("Because nominal damages ... are the appropriate means of vindicating rights whose deprivation has not caused actual, provable injury, and because the statute does not reveal any attempt to alter that rule with respect to this class of cases, we now hold that section 1997e(e) does not bar recovery of nominal damages for violations of prisoners' rights.") (internal quotations omitted).*

allegations in the complaint, the alleged sexual assaults qualify as physical injuries as a matter of common sense. Certainly, the alleged sexual assaults would constitute more than de minimis injury if they occurred."). Regardless, defendant Pavliska waived this affirmative defense by failing to plead it in her answer. <u>Douglas v. Yates</u>, 535 F.3d 1316, 1320 (11th Cir. 2008) ("In the light of <u>Jones</u>,[39] we conclude that the limitation of complaints by prisoners for emotional injury, 42 U.S.C. §1997e(e), provides an affirmative defense, not a jurisdictional limitation."). The general conclusory assertion of "[f]ailure to . . .comply with statutes, rules, or regulations as a requisite to filing this lawsuit," Doc. # 36, p. 2, ¶8, is inadequate to raise the defense of § 1997e(e).

As for her affirmative defense that Ms. Gaytan and Ms. Castillo did not exhaust their administrative remedies, defendant Pavliska has not met her burden of offering evidence demonstrating the existence of a grievance procedure. Proof that inmates were instructed that "they should report any wrongdoing," Doc. #86, p. 15, ¶17, does not show Hillsdale had a grievance procedure with which the inmates were required to comply.

Defendant Pavliska's motion for summary judgment as to the claims of Garell, Reeder, Gaytan and Castillo will therefore be denied

Defendant Humphries

Defendant Humphries contends that he is entitled to summary judgment because four plaintiffs, Castillo, Gaytan, Robinson and Garell, admit that he never behaved inappropriately

---

[39] <u>Jones v. Bock</u>, 549 U.S. 199 (2007).

with him and the claim of the remaining plaintiff, Reeder, is untimely.[40]  Without evidence that Humphries violated their constitutional rights, the claims of plaintiffs Castillo, Gaytan, Robinson and Garell's claims against Humphries fail.

That leaves plaintiff Reeder's claim against Humphries.  A question exists as to whether her claim is time-barred, because she testified that Humphries raped her on April 22, 2008.  The court does not, though, reach that issue because there is a more fundamental problem with Ms. Reeder's claim.

The Tenth Circuit has held that "only prison officials and those to whom they delegate penological responsibilities for prisoners have Eighth Amendment duties and attendant liabilities."  Smith v. Cochran, 339 F.3d 1205, 1213 (10th Cir. 2003).  In Smith the Tenth Circuit concluded, though, that Oklahoma Department of Public Safety ("DPS") employees who were delegated supervisory authority over state prisoners working at DPS pursuant to a Prisoners Public Works Project Contract, "also bore the duty under the Eighth Amendment to refrain from using excessive force against prisoners."  Id.  However, Ms. Reeder has not alleged, and there is no evidence in the record demonstrating that, Humphries was delegated supervisory authority over her (or any other inmates) when she worked at the Governor's Mansion.  Plaintiffs allege in the amended complaint that "Bobelu's job duties included directly supervising the female inmates from Hillside . . . ." Doc. #8, ¶31, but make no

---

[40]*Plaintiffs argue for the first time that Humphries is liable to them because he conspired with Bobelu.  They did not, though, allege a conspiracy claim in their amended complaint, request leave to amend to add a conspiracy claim or otherwise alert defendants that they were alleging that Bobelu and Humphries conspired to violate their Eighth Amendment rights.  Under these circumstances, plaintiffs will not be allowed to assert a new conspiracy claim in their response brief.*

similar allegations with respect to Humphries.  Under these circumstances, the court has no choice but to grant defendant Humphries' motion as to all plaintiffs' claims.  Ms. Reeder may have claims against Humphries under state law or otherwise, but does not have a viable §1983 claim for violation of her Eighth Amendment rights as asserted here.

Conclusion

The motions for summary judgment of defendants Jones-Cooper, Dolan and Larsen, and Humphries [Doc. Nos. 88, 90, 87, 83 ] are **GRANTED**.  The motion for summary judgment of defendant Day [Doc.#89] is **DENIED**.  The motion for summary judgment of defendant Pavliska [Doc. #84] is **GRANTED** with respect to the claims of plaintiff Robinson and **DENIED** with respect to the claims of plaintiffs Garell, Reeder, Gaytan and Castillo. An appropriate judgment will be entered when the case is concluded with respect to all claim and parties.  Fed.R.Civ.P. 54(b).

Plaintiffs also sued Jane Doe and John Doe guards, but never identified or served them.  Plaintiffs' claims against the Doe defendants are **DISMISSED**.

**IT IS SO ORDERED**.

Dated this 27th day of February, 2014.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE